OPINION OF THE COURT
Lorraine Miller, J.
Defendant, whose first trial ended with a "hung jury”, is charged with robbery, third degree, and grand larceny, fourth *72 degree. On this second trial defendant moved for permission to present to the jury Dr. Robert Buckhout, Ph. D., professor of psychology and an expert in the field of memory and perception, to testify concerning various social, physical and perceptual factors which affect the reliability of eyewitness testimony. The prosecution cross-moved to preclude such testimony.
The facts are: On February 5, 1987, at 10:00 p.m., complainant was returning home. As she neared her front door, a "male, black, wearing a gray sweatshirt,” approached her from behind, took her bag and fled. Having heard his wife scream, complainant’s husband (who was in their apartment) chased the perpetrator for several blocks, describing him as wearing a "light green jacket.” He was unable to apprehend him.
Complainant told police she recognized defendant when she was shown photos the same evening. One week later, a lineup was held at which she selected defendant. At the first trial, defendant and several other witnesses testified defendant was at home when the alleged crime occurred. The jury was unable to reach a verdict at the conclusion of the first trial.
Trial and appellate courts have long recognized the "built-in potential for error in eyewitness cases” and the great care required in scrutinizing this type of testimony. (People v Daniels, 88 AD2d 392, 401 [2d Dept 1982]; People v Lewis, 137 Misc 2d 84 [Monroe County Ct 1987].) The admissibility of expert testimony on a particular issue is generally addressed to the sound discretion of the trial court and the court must determine "when jurors are able to draw conclusions from the evidence based on their day-to-day experience * * * and when they would be benefited by the specialized knowledge of an expert witness.” (People v Cronin, 60 NY2d 430, 433 [1983].) In view of the crucial nature of the eyewitness testimony in this case, the motion was granted and a hearing held outside the presence of the jury. (Such practice has previously been approved.) (People v Lewis, supra; People v Brooks, 128 Misc 2d 608 [Westchester County Ct 1985].)
Despite widespread recognition of the shortcomings and potential flaws of eyewitness testimony, courts in many jurisdictions have been reluctant to admit expert testimony concerning unreliability on general evidentiary grounds. Expert testimony has also been precluded on the basis that propo *73 nents failed to adequately establish the qualifications and expertise of the particular expert witness, thereby failing to lay a sufficient evidentiary foundation. (See, Porter v State, 94 Nev 142, 576 P2d 275 [1978]; State v Brown, 17 Wash App 587, 564 P2d 342 [1977] [court had the sound discretion to decide on the lack of qualifications of expert witness]; State v Valencia, 118 Ariz 136, 575 P2d 335 [1977] [not error to disallow expert testimony on the limitations and weakness of eyewitness testimony].)
Others have ruled that such testimony has not attained general acceptance in the legal and scientific communities. (People v Brown, 117 Misc 2d 587 [Westchester County Ct 1983] [expert’s research had not reached the required level of scientific acceptance]; United States v Sims, 617 F2d 1371 [9th Cir 1980].) Finally, some courts have held that such testimony is not the proper subject for expert testimony since the reliability of eyewitness testimony is not beyond the understanding of lay jurors. (People v Trent, NYLJ, July 30, 1986, at 12, col 3; People v Valentine, 53 AD2d 832 [1st Dept 1976]; United States v Purham, 725 F2d 450 [8th Cir 1984]; State v Hoisington, 104 Idaho 153, 657 P2d 17 [1983]; State v Wooden, 658 SW2d 553 [Tenn 1983]; State v Onorato, 142 Vt 99, 453 A2d 393 [1982]; State v Ammons, 208 Neb 812, 305 NW2d 812, 814 [1981] ["(t)he accuracy or inaccuracy of eyewitness observation is a common experience of daily life”]; People v Dixon, 87 Ill App 3d 814, 410 NE2d 252 [1980].)
Concern has also been expressed that admission of scientific evidence would needlessly transform a trial into a " 'battle of experts’ ”, and the traditional methods of testing truthfulness by effective cross-examination, zealous summation and Wade hearings are sufficient. (See, People v Trent, supra at 12, col 4; United States v Amaral, 488 F2d 1148 [9th Cir 1973].)
At the hearing Dr. Buckhout explained various social, perceptual and cognitive factors which scientific studies have demonstrated are relevant to eyewitness identification. In accordance with the court’s instructions he refrained from offering any opinion as to the integrity or reliability of the identification in the instant case or the credibility of the complainant or the suggestability of any of the police procedures employed. (The same expert was permitted to testify under identical circumstances in a scholarly opinion by Judge Lange in People v Brooks, supra.) After an extensive hearing this court holds that Dr. Buckhout may testify at trial within *74 the same parameters and subject to a proper limiting charge.* (See also, State v Chapple, 135 Ariz 281, 660 P2d 1208 [1983]; People v McDonald, 268 Cal Rptr 236, 690 P2d 709 [1984]; United States v Downing, 753 F2d 1224 [3d Cir 1985].) A sufficient evidentiary foundation and Dr. Buckhout’s expertise in the psychological factors which influence memory and perception and their relationship to identification testimony were sufficiently established. This court was also persuaded that such testimony would clarify and assist the jury without invading their province.
Accordingly, the witness will be permitted to testify at trial to (1) the effect of stress on identification which scientific research has demonstrated affects a person’s ability to remember (this occurs, it was stated, when the criminal encounter is characterized by violence or a weapon and the witness tends to focus on the weapon rather than the physical characteristics of the perpetrator); (2) the psychological effect of delay between the criminal event and the subsequent identification; (3) the lack of correlation between a prospective witness’ confidence and the accuracy of such recollection, and (4) the assimilation of postevent information.
It has previously been recognized that the initial encounter between defendant and complainant can be affected by and *75 evaluated on the basis of the duration, distance and physical surroundings of the viewing and the credibility of the complainant. (People v Daniels, supra; Sobel, Eyewitness Identification; 1 CJI[NY] 10.01.) (Indeed the thrust of the court’s usual identification charge is that a jury must scrutinize various factors in deciding whether the eyewitness had an adequate opportunity to view the perpetrator, namely, lighting, distance, facial features, body size, hair, skin, clothing and the mental, physical and emotional state of the witness and any description given to the police. Such a charge provides the jury with an almost exhaustive panorama of physical and mental factors and conscious details to analyze in determining whether a viable identification has been made. But this charge is not without its limitations.)
Empirical studies have demonstrated, however, that there are other psychological processes at work which can affect, impair and call into question the integrity of the initial viewing. As one commentator explains it, "As regards memory, there are other psychological processes at work. For instance, a witness can unconsciously incorporate post-event information which will alter the original memory, especially as to particular details. This memory reorganization occurs at a mental level uncontrolled by the subject, although the end result has the same appearance as intentional lying on the part of the witness. Memory is an active, continuing process in which new elements are continuously interwoven into the overall recollection until the subject cannot distinguish one from the other. In complex situations, memory can be adversely affected at its very inception.” (Abney, Expert Testimony and Eyewitness Identification, 91 Case & Com, 28 [Mar.-Apr. 1986]; see also, Loh, Psycholegal Research: Past and Present, 79 Mich L Rev 659, 660-661 [1981]; Clifford and Bull, The Psychology of Person Identification [1978]; Loftus, Eyewitness Testimony [1979]; McCord, Syndromes, Profiles and other Mental Exotica: A New Approach to the Admissibility of Nontraditional Psychological Evidence in Criminal Cases, 66 Ore L Rev 19, 20-108 [1987].)
This court believes that these processes and factors are not necessarily within the knowledge of the typical juror nor are they a part of the court’s typical charge. Nevertheless, it is essential information which is not in accord with common perceptions and admission of such testimony will result in a "better-informed decision” by the jury. (People v Brooks, supra, at 619.) Secondly, admission of such testimony would not *76 usurp the jury’s function in determining the guilt or innocence of the defendant. They can ultimately reject or accept such testimony!
Dr. Buckhout will also be permitted to testify to the effect of repeated viewings. Buckhout’s and other experts’ studies have revealed that a person’s ability to recall past events and retrieve stored information can be influenced and impaired by the following factors: the size and type of photos used in photo arrays, the phrasing of questions, and the expectations of a complainant. These factors coupled with a complainant’s self-induced pressure to cooperate with the police may lead a person to identify at least one of the people placed before him with repeated viewings, merely reinforcing the initial flawed identification. This leads to what experts call an "unconscious transference” in which the eyewitness confuses a person viewed in one context with a person observed in an entirely different situation. (See, Abney, op. cit, at 28.)
This phenomenon is again not within the typical ken of an ordinary juror. Nor would it be adequately purged or revealed by Wade hearings, cross-examination or summation since it is largely an unconscious process which the complainant is not cognizant of. (See, People v Trent, supra.) In the instant case, the complainant initially identified the defendant from a photograph and thereafter in a lineup, which this court found was fair and not suggestive. To permit the jury to hear evidence of the effect of repeated viewings and the possibility of unconscious transference would enable them to make a more reasoned decision on whether the complainant was indeed identifying the actual perpetrator or rather the person she saw depicted in the lineup. (It should also be remembered that complainant has viewed the defendant at prior hearings and trial.)
The final psychological factor which Dr. Buckhout will be permitted to testify to is cross-racial identification. It is contended that it is much easier for a person to identify a person of his own race rather than another. (Racial bigotry or lack of prejudice is irrelevant as is considerable contact with persons of another race. [Abney, op. cit., at 27; see also, Johnson, Cross-Racial Identification Erros in Criminal Cases, 69 Cornell L Rev 934, 957 (1984); Wall, Eye-witness Identification in Criminal Cases (1965).] This phenomenon is crucial for the deliberative process as jurors are more apt to comfortably discuss racial differences without fear of discord in the jury room if there is some basis for such discussion in the record. Secondly, *77 the difficulty of and possibility for error in cross-racial identifications is not something within the ordinary experience of jurors.)
The court’s decision in this case is not to be taken as an intimation that such expert testimony is relevant and material and admissible in every case. The decision to admit or preclude such testimony is discretionary with the Trial Judge and can only be properly made on an ad hoc basis and upon careful scrutiny of the operative facts. In the instant case, the alleged robbery occurred in seconds; the initial viewing was quick and under dimly lighted conditions when the perpetrator approached complainant from the rear (complainant and defendant are of different races); the complainant’s husband was unable to identify the accused although they are of the same race; the accused produced an alibi defense; the first jury to consider the evidence could not return a unanimous verdict; and finally, the defendant and other witnesses protested his innocence in an unwavering fashion. Under such circumstances it might indeed be an abuse of discretion not to admit such testimony. Furthermore, the prosecution cannot claim substantial prejudice. The People can effectively cross-examine this witness or call experts of their own. Defendant’s motion is granted in the interest of justice.

 "You will recall that the witness, Dr. Robert Buckhout, gave testimony concerning his qualifications as an expert in the field of memory and perception. When a case involves a matter of science or art, requiring special knowledge or skill not ordinarily possessed by the average person, an expert is permitted to state his opinion for the information of the court and jury. The opinion stated by the expert who testified before you was based on particular facts or scientific studies. You may reject an expért’s opinion if you find the facts to be different from those which formed the basis for the opinion. You may also reject his opinion if after careful consideration of all the evidence in the case, expert and other, you disagree with the opinion. In other words, you are not required to accept an expert’s opinion to the exclusion of the facts and circumstances disclosed by other testimony. Such an opinion is subject to the same rules concerning reliability as the testimony of any other witness. It is given to assist you in reaching a proper conclusion, is entitled to such weight as you find the expert’s qualifications in his field warrant and must be considered by you, but is not controlling upon your judgment. Dr. Buckhout was admitted solely for the limited purpose of providing you the jury with various factors which scientific studies have shown are relevant to a person’s ability to perceive and remember and for no other purpose.
"You are not to use Dr. Buckhout’s testimony to discredit or accredit the reliability of eyewitness testimony in general or in this case. You the jury are the sole and exclusive judges of the reliability and credibility of the eyewitness testimony in this case.”